47 CCPA

**Leo E. JACOBS**

v.

**William E. SOHL.**

**Patent Appeal No. 6566.**

United States Court of Customs and Patent Appeals.

July 13, 1960.

Hofgren, Brady, Wegner, Allen & Stellman, Francis C. Browne, Jules L. Brady, Chicago, Ill. (William J. Stellman, Chicago, Ill., of counsel), for appellant.

Carpenter, Abbott, Coulter & Kinney, William H. Abbott, St. Paul, Minn. (Stanley DeLaHunt, St. Paul, Minn., of counsel), for appellee.

Before WORLEY, Chief Judge, and RICH, MARTIN, and SMITH, Associate Judges, and Judge WILLIAM H. KIRKPATRICK.[1]

RICH, Judge.

This appeal is from the decision of the Board of Patent Interferences of the United States Patent Office awarding priority in Interference No. 87,936 to William E. Sohl, the junior party. The invention relates to the use of a ring made of glass filaments for reinforcing abrasive wheels and is defined in four counts which are as follows:

"1. In an annular rotatable abrasive article formed of abrasive grains held by a binder, reinforcing means comprising a ring around the central axis of rotation of the article concentric to said axis and embedded in said article, the ring including a plurality of force resisting glass fibers arranged in layers extending arcuately around said axis and reinforcing the article against disruption by centrifugal force, said fiber in each layer being arranged in a helix with succeeding coils being closely adjacent to each other and an adherent coating around said fibers of a material compatible with said article and said fibers being substantially entirely arranged transversely to the directions of centrifugal force to resist said force substantially entirely in tension.

"2. A high-speed rotative abrasive article reinforced against bursting and flying apart at advanced rotative velocities comprising abrasive grains bonded by an abrasive binder and at least one preformed reinforcing ring adherently affixed within said article and approximately concentrically positioned therein, said ring comprising a plurality of convolutely wound lineally aligned continuous glass monofilaments adherently embedded within and individually surrounded by a strong abradable unifying binder matrix for uniting and protecting said monofilaments.

"3. A preformed narrow reinforcing ring adapted for use in the manufacture of rotative abrasive articles highly resistant to bursting and flying apart at advanced rotative velocities, said ring comprising a plurality of convolutely wound lineally aligned continuous glass

1. United States Senior District Judge for the Eastern District of Pennsylvania, designated to participate *in place of Judge* *O'Connell*, pursuant to provisions of Section 294(d), Title 28 United States Code.

monofilaments adherently embedded within and individually surrounded by a strong abradable unifying binder matrix for uniting and protecting said monofilaments.

"4. In the manufacturing of grinding wheels, the process comprising forming an annular structure consisting of a number of adjacent filament elements wound into the desired annular form to provide a compact body, incorporating a thermosetting resin into said annular structure, setting said resin until the structure is rigidified, embedding the resulting rigidified structure as a reinforcement into the interior of a mass formed of abrasive particles bonded together by a thermosetting resin and shaped to the form of the desired grinding wheel, and applying heat to the resulting mass until it is set in the desired shape."

The essence of the invention is the provision of a ring consisting of adjacent glass filaments wound to the desired form and embedded in a thermosetting resin, which ring, in turn, is embedded in the abrasive wheel. Counts 1 and 2 are drawn to the wheel including the glass and resin reinforcing ring, count 3 to the ring *per se,* and count 4 to the method of forming the ring and incorporating it in the wheel.

The following facts are clearly established and do not appear to be in dispute:

Throughout 1953 the senior party Jacobs was president of Titan Abrasive Company, hereafter referred to as Titan, while the junior party Sohl was employed by Minnesota Mining and Manufacturing Company, hereafter referred to as Minnesota. During the summer of 1953 Minnesota was interested in developing new uses for a material consisting of aligned glass filaments embedded in a high strength adhesive resin film. Prior to that time this material had been used as a radial reinforcement for cut off wheels which were used for cutting stone and which were in the nature of circular

saws. The material was incorporated in the wheel in the form of layers. Sohl undertook to interest manufacturers of grinding wheels in the reinforcing material and on August 4, 1953 visited Titan for that purpose and interviewed Frank O. Shoemaker, a research engineer of that company.

As a result of that interview it was agreed that Sohl should prepare some reinforcing rings for abrasive wheels and send them to Titan. Three pairs of rings were prepared by Sohl and shipped to Titan in September 1953, where they were incorporated in abrasive wheels and tested. It has been stipulated by the parties that these rings satisfy the requirements of each of the counts in all respects as to the glass filament containing resin ring, that the wheels in which they were embedded satisfy all the requirements of counts 1, 2 and 4, and that such wheels were successfully tested "within say ten days after their manufacture."

The sole issue is one of originality since the parties rely on the same articles and tests for reduction to practice, and since each claims that the invention was derived from him by his opponent.

Jacobs claims to have conceived the invention in March 1953 and to have discussed it with Shoemaker then and at several other times prior to the August 1953 conference between Sohl and Shoemaker. The only contemporaneous documentary evidence bearing on this alleged earlier conception and disclosure consists of copies of the Wall Street Journal describing the use of glass fiber for various purposes. Jacobs states that when he saw these descriptions it occurred to him that such glass might be used for reinforcing abrasive wheels. As to his alleged disclosure of the invention to Shoemaker, Jacobs, in answer to Sohl's interrogatories, testified as follows:

"Q66. What time of day was it that you made your alleged suggestion to Mr. Shoemaker in March of 1953? A. Early morning, as soon as I got down.

"Q67. What did you tell him? A. I told him that I had been reading articles in the Wall Street Journal, and that I noticed that vast improvements had been made in fiberglass items. I said why wouldn't it be a good idea to make a fiberglass ring instead of a steel ring to embed in the wheel?

"Q68. Is that what you told him? A. Exactly.

"Q69. That is exactly what you told him? A. That is exactly what I told him.

\* \* \* \* \* \*

"Q78. Did you make any suggestion to Mr. Shoemaker following your alleged conversation on March 18 or 19, 1953 expanding your concept that you had given him earlier? \* \* \* A. Only that there were more and more articles appearing in the publications on the use of fiberglass as a substitute for steel.

"Q79. You left this pretty much to Mr. Shoemaker, didn't you? A. That is right."

Jacobs' categorical testimony that his original disclosure consisted merely in the idea of using fiber glass to replace the steel reinforcing rings previously used is confirmed by Shoemaker's testimony in answer to XQ 346 that:

"He left up to me to establish the final form of the ring and how it was to be manufactured. His part of it was that he wanted a ring made out of fiberglass of similar size and general configuration of the steel ring that we normally use in this operation."

It is true that Jacobs and Shoemaker later testified, the latter in response to a decidedly leading question, that Jacobs also disclosed the use of continuous glass filaments, but that testimony is of doubtful value since it conflicts with the clear indication in the testimony previously quoted above, that the details of forming the ring were left to Shoemaker. The testimony as to what Shoemaker did after Jacobs made his disclosure also indicates that such disclosure was vague. He first attempted to make a ring from electrical insulating tape or tubing made of woven glass material. This material "had the fibers woven on a bias and therefore stretched" so that it was not successful. As to his other experiments prior to his conference with Sohl, Shoemaker stated that "I tried some roving, glass fiber roving, which is like cotton, and that is all." Neither of those experimental forms approximated the specific arrangement of continuous adjacent filaments wound into the desired form and incorporated in an adherent coating as called for by the counts.

. Regardless of what Jacobs may have thought of or disclosed to Shoemaker before Sohl's visit to Titan, it is clear from the foregoing that neither of them had sufficient information or understanding to enable them to construct a satisfactory abrasive wheel having a glass fiber reinforcing ring meeting the counts. This is conceded in the following statement in the brief for Jacobs, which is amply supported by the record:

"On August 4, 1953, the date of the party Sohl's call upon the Titan Abrasives Company, Mr. Shoemaker was still looking for a glass filament material which he could form into rings as a substitute for the steel rings used in grinding wheels. To that date he had not found the material which he considered suitable or which he could form into the desired shape and rigidity."

As was said in Mergenthaler v. Scudder, 11 App.D.C. 264, 276, 1897 C.D. 724, 731:

"The conception of the invention consists in the complete performance of the mental part of the inventive act. All that remains to be accomplished, in order to perfect the act or instrument, belongs to the department of construction, not invention. It is therefore the formation, in the mind of the inventor, *of*

*a definite and permanent idea of the complete and operative invention as it is thereafter to be applied in practice * * * ."*

We have frequently approved that statement. See Bac v. Loomis, 252 F.2d 571, 45 CCPA 807, and cases there cited. Clearly no such definite and permanent idea was disclosed by Jacobs to Shoemaker before Sohl's visit. If it had been, Shoemaker would not still have been looking for a satisfactory material.

■■ Jacobs' testimony, as well as that of Shoemaker, who is the only one purporting to corroborate him on that matter, is based merely on recollection and since the testimony was given more than four years after the events to which it relates it is evident that it must be closely scrutinized. In our opinion Jacobs has failed to show that he conceived a method or device having the essential elements of any of the counts prior to the meeting between Shoemaker and Sohl. It is to be noted in this connection that Jacobs' application contained claims to an abrasive article having embedded in it a reinforcing ring including glass fibers extending around its axis, and that those claims were rejected as unpatentable over prior art and cancelled. Apparently no novelty was involved in the method in which the new rings were incorporated in the abrasive wheels. They were used to replace the steel reinforcing rings previously used and were incorporated in the wheels in the same manner as those rings. Obviously, therefore, the broad idea of replacing the steel reinforcing ring of an abrasive wheel by a ring of glass fibers does not involve a conception of the invention in issue.

■ The parties agree that the invention here in issue had been fully conceived and, regardless of who conceived it, that both parties were in possession of it at the conclusion of the Shoemaker-Sohl conference on August 4, 1953. Accordingly, since Jacobs was not present at the conference and has not established conception prior thereto, the conception which occurred during the conference must have been that of either Sohl or Shoemaker, and Jacobs was not in possession of a complete conception until he discussed the matter with Shoemaker after Sohl had gone. It follows that, *as between the parties to this proceeding*, Sohl was the first in possession of the invention, whether he conceived it himself or derived it from Shoemaker. Since what Jacobs disclosed to Shoemaker prior to August 4, 1953 was, at best, no more than what was known in the art, Jacobs cannot be regarded as an inventor on the basis of anything done by Shoemaker, even though it was Jacobs' suggestion which started Shoemaker to work on glass fiber reinforced abrasive wheels. It is well settled that the sole issue in an interference is priority between the parties and that evidence that a party to the interference derived the invention from one who is not a party thereto will not be considered. Raymond et al. v. Wickersham, 110 F.2d 863, 27 CCPA 1079; Holister et al. v. Maynard, 129 F.2d 877, 29 CCPA 1249, and cases there cited.

■ Even if it be assumed, however, that Jacobs is entitled to the benefit of anything Shoemaker may have disclosed to Sohl, we agree with the board that the record will not support a holding of any such disclosure by Shoemaker of the invention in issue.

In the first place, Shoemaker does not claim to have disclosed to Sohl all the features recited in the counts. He testified that "I described in detail the ring that was used in a snagging wheel, and asked him [Sohl] if he could make such a ring out of this tape." The "ring that was used" was the steel reinforcing ring, and Shoemaker stated that he described it as to size, material and position and that "we discussed the cross section of the wire and the size of fiberglas ring that he could make up for me with this material, and did some calculations on the tensile strength of the fiberglas tape to be laminated to the same cross sectional area to compare with the steel ring."

It is to be noted that Shoemaker did not state that he suggested laminating the fabric, but merely that that matter was discussed. Neither did he state that he suggested using layers of glass fibers, each layer being arranged in a helix, as recited in count 1, a plurality of convolutely wound lineally aligned continuous glass monofilaments adherently embedded in a unifying binder matrix, as recited in counts 2 and 3, or a number of adjacent filament elements wound to desired form and incorporated in a thermosetting resin, as required by count 4. Accordingly, even if Shoemaker's testimony is accepted at its face value it does not establish a disclosure by him to Sohl of the invention in issue.

Moreover, the question as to whether Sohl or Shoemaker made the suggestion of using the material which Sohl brought to Titan for making reinforcing rings is sharply in dispute and their testimony on the matter is in direct conflict. There were no other witnesses to the suggestion, but it is significant that in a letter to Shoemaker dated October 6, 1953, two months after the August 4, 1953 conference and before any dispute as to inventorship had arisen, Sohl said:

> "You will recall you showed me how iron rings were used, and I suggested we try the stronger glass and plastic rings."

Although the correspondence between Shoemaker and Sohl continued for several months it does not appear that Shoemaker ever undertook to deny the accuracy of the quoted statement.

Upon the record as a whole, we agree with the conclusion of the board that it is clearly indicated that even the broad suggestion of using the glass fibers embedded in resin for making the reinforcing rings originated with Sohl and was disclosed by him to Shoemaker who, in turn, disclosed it to Jacobs on August 4, 1953, shortly after the conference.

■■ We have not overlooked the fact that Jacobs filed his application on October 23, 1953 and was thus senior by almost a year to Sohl who did not file until September 10, 1954. In cases such as this, where it is agreed that both parties were fully cognizant of the invention before either of them filed his application, no evidentiary significance attaches to the order in which they filed. A hasty filing may result as readily from a desire to appropriate the invention of another as to protect one's own. Moreover, Gilbert B. Gehrenbeck, an attorney for Minnesota, testified that on September 4, 1953, only a few days after the first rings were shipped to Titan, Sohl proposed to him that an application be filed covering such rings. That proposal, together with the above-quoted statement in Sohl's letter of October 6, 1953 to Shoemaker, amply rebuts any suggestion that Sohl did not regard himself as the inventor of the rings at the time when he made them.

It is vigorously contended by Jacobs that the conduct of Sohl and Minnesota with respect to Alfred J. Sandorff, a former party to the interference, indicates that Sohl did not regard himself as the inventor of the subject matter here in dispute. It appears that after the shipment of the rings to Titan, Sohl engaged in extensive experimental work with Sandorff along similar lines and that when the latter filed an application Minnesota negotiated with him with a view to obtaining a license under it. It does not appear, however, that those negotiations involved any recognition by Sohl or Minnesota that Sandorff was prior to Sohl as to the invention here in issue. On the contrary the record indicates that as soon as Sohl learned that Sandorff was asserting claims covering that invention he advised Sandorff's attorney as to his own claim to it. Sandorff stated that his first meeting with Sohl took place in "September or maybe October, thereabouts" of 1953, which was after Sohl had made the first rings and sent them to Titan. Sohl was admittedly in possession of the invention here in issue at that time and it is not clear how he could ever have regarded Sandorff as being the first inventor of it.

The decision of the Board of Patent Interferences that Sohl is the original inventor of the subject matter in controversy is accordingly affirmed.

Affirmed.